IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WILHEMINA JOHNSON-WIGGINS,<br>    Plaintiff,<br><br> v.<br><br>NEW JERSEY DEPARTMENT OF<br>HUMAN SERVICES/ANCORA<br>PSYCHIATRIC HOSPITAL<br>    Defendant. | :<br>:<br>:<br>:<br>: Civ. No. 20-802<br>:<br>:<br>:<br>:<br>:<br>: |

**Diamond, J.**                                        **November 15, 2022**

**MEMORANDUM**

  Wilhemina Johnson-Wiggins, a Black woman, alleges that because she complained to her employer, Ancora Psychiatric Hospital, that her supervisor impermissibly favored employees of native African origin, she suffered retaliation in violation of Title VII and the New Jersey Law Against Discrimination. (42 U.S.C. § 2000e *et seq.*; N.J.S.A. § 10:5-1 *et seq.*; Compl. (Doc. No. 1); see Doc. No. 25-2 ¶ 1.) Ancora moves for summary judgment, which I will grant.

  **I.  BACKGROUND**

  I have resolved all factual disputes and made all reasonable inferences in Plaintiff's favor. Hugh v. Butler Cnty. Fam. YMCA, 418 F.3d 265, 267 (3d Cir. 2005). My task has been made more difficult by Plaintiff's evasive, contradictory deposition testimony, and her seeming inability to remember material facts and events. (See, e.g., Pl. Dep. (Doc. No. 25-5) at 6, 31, 40, 98-100, 105-07, 111, 118-122, 128, 132.)

1

Plaintiff's Employment and Employer

Plaintiff was an "Advance Practice Nurse" at the New Jersey Health Department's Ancora facility. (Statement of Undisputed Facts (Doc. Nos. 25-2, 26) (SOUF) ¶¶ 2, 4, 14.) Hired in 1996 as a Staff Nurse, she was promoted twice. (Id. ¶¶ 12-14.) Plaintiff held the position of "non-prescribing" APN from 2009 until her retirement on April 1, 2020. (Id. ¶ 34.) The APN position requires a master's degree in Nursing, which Plaintiff holds. (Id. ¶ 15.) "Non-prescribing" APNs (i.e., those not formally trained to write prescriptions) were usually assigned to one of Ancora's treatment buildings: Birch Hall, Larch Hall, Cedar Hall, Holly Hall, and the Main Building. (Id. ¶¶ 15, 19, 35-36.)

Birch Hall, Ancora's admissions facility, houses all patients awaiting assignment to another building. (Id. ¶ 44.) Larch Hall houses psychiatric patients with substance abuse problems. (Id. ¶ 39.) The patients at Cedar Hall have a "mental retardation diagnosis and a psychiatric diagnosis, and developmental disabilities." (Id. ¶ 41.) Holly Hall houses patients "who might have been found not guilty by reason of insanity or have other criminal aspects to their psychosis." (Id. ¶ 43.) Lastly, the Main Building houses geriatric psychiatric patients. (Id. ¶ 38.)

Until January 2017, Plaintiff's direct supervisor was Chief Nursing Officer Catherine Jones; Dr. Evelyn Ngwa—who, Plaintiff believes, "is of African descent"—then became CNO. (Id. ¶¶ 5, 6, 8; Doc. No. 26 at 1.) Plaintiff worked under Ngwa as a non-prescribing medical APN. (Supplemental SOUF (Doc. Nos. 26, 27-2) ¶ 1; Pl. Dep. at 100:5-7.) APNs would sometimes do both administrative and clinical work. (Pl. Dep. at 99:21-23.) Accordingly, at some point, Jones asked Plaintiff to perform administrative work in the Nursing Education Department as well as her clinical duties in Larch Hall. (SOUF ¶¶ 40, 45; Pl. Dep. at 93:5-21.)

2

Administrative Duties

Ngwa gradually moved Plaintiff from clinical work to administrative work. (SOUF ¶ 46; Pl. Dep. at 93:25-94:7.) Plaintiff retained her APN position; her salary and benefits were unchanged. (Supplemental SOUF ¶ 4; see also Pl. Dep. at 9:25-10:2.) Plaintiff thus administered nursing education, quality assurance, and retention. (SOUF ¶ 47; Supplemental SOUF ¶ 4.)

Plaintiff also worked on recruitment with Ngwa, Dayna Cormaney, and Patricia Singleton. (Pl. Dep. at 11:11-12:5; Supplemental SOUF ¶ 7.) Ngwa would occasionally ask Plaintiff and others to serve on a three-member hiring panel. (Pl. Dep. at 12:25-13:9; Supplemental SOUF ¶ 9.) From 2017 to 2019, Plaintiff conducted interviews and participated in the hiring of some seven people. (Pl. Dep. at 15:8-14, 19:11-12; Supplemental SOUF ¶ 10.) Plaintiff testified that before each interview, Ngwa would tell the panel "who she wanted" to fill the vacant position. (Supplemental SOUF ¶¶ 11-12; Pl. Dep. at 16:5-6.)

Plaintiff urges that "Ngwa showed preferential treatment toward other workers of African descent to the detriment of other Americans." (Doc. No. 26 at 1.) Plaintiff thus testified that she saw "a pattern" of hiring candidates "of national origin, native origin, African origin." (Pl. Dep. 15:15-16:5; Supplemental SOUF ¶¶ 11-13.) Plaintiff believes Ngwa knew in advance which candidates were of native African origin. (Pl. Dep. at 16:10-17; Supplemental SOUF ¶ 12.) Plaintiff testified that before the interview for the Director of Nursing position, "[Ngwa] told us who she wanted . . . and that's who we chose, as long as they were qualified." (Pl. Dep. at 20:20-22.) Ngwa subsequently told the panel that she wanted to hire Michael Voll, a white man, because "there was a lot of heat about her hiring Africans in and promoting them." (Id. at 26:19-27:3, 125:19-126:1 (Plaintiff: "[Ngwa] said, oh, I'm going to let him be in there so that he

3

can be the white prize.").)  Plaintiff has presented no evidence suggesting that Ancora's hiring practices were otherwise ever questioned.

Organizational Changes

In November 2018, Ancora employed six APNs: Plaintiff, Chinma Nnaji, Mary Jennings, Osman Jalloh, Yardley Costa, and Mojisola Odunuga.  (SOUF ¶ 22.)  Jalloh was assigned to Birch Hall (Id. ¶ 27), Nnaji to the Main Building (Id. ¶ 28), and Jennings to Holly Hall (Id. ¶ 29).  In 2018, Odunuga was assigned to Cedar Hall until she lodged a hostile work environment claim against a co-worker and was reassigned to Larch Hall.  (Id. ¶ 31.)  Following Odunuga's reassignment, Cedar Hall was the only building without an APN.  (Id. ¶ 33.)

The CNO conducted monthly meetings of all nursing departments.  (SOUF ¶ 51.)  At the November 27, 2018, meeting—which both Ngwa and Plaintiff attended—those present discussed "APN role as Clinicians."  (Id. ¶¶ 53-55; Def. Ex. C (Doc. No. 25-5) at 2.)  The meeting minutes provide: "APN credentialing is scheduled for December 12, 2018, once credentialed[,] Prescribing APN's [sic] will have an assigned building.  The following APN's [sic] will be in a prescribing role once credentialed[:] Ms. Ngwa, Ms. Jennings, Ms. Nnanji, Ms. Odunuga, Ms. Johnson-Wiggins and Mr. Jalloh."  (Def. Ex. C at 2.)  Plaintiff testified that she had only begun the credentialing process.  (Pl. Dep. at 99:10-14.)  This did not affect her duties, however, because, as Plaintiff testified, "both [prescribing and non-prescribing APNs] are qualified to prescribe."  (Id. at 6:14-22.)

At the November meeting, the nursing staff learned of a new organizational plan conceived by New Jersey Assistant Health Commissioner Christopher Morrison and Ancora CEO Joseph Canale.  (SOUF ¶¶ 9, 10, 59.)  Intended to improve Ancora's operating efficiency and effectiveness, the Plan moved administrative responsibility of the Nursing Education Department

4

from CNO Ngwa to Kathleen Engstrom of the Staff Development and Training Unit. (Id. ¶ 60.) As Plaintiff did not work for that Unit, she knew at the November meeting that her administrative duties would be reassigned. Although Plaintiff believed that the Morrison/Canale Plan would not apply to her (Pl. Dep. at 113:5-25), the minutes of the meeting do not provide for any exceptions (Def. Ex. C at 2), nor does anything in the record support that belief.

On January 31, 2019, Ancora's HR Director Alfred Filippini distributed a "Human Resources Staffing Request Form," to implement the transfer of Nursing Education duties to SDT. (SOUF ¶ 62; Def. Ex. D (Doc. No. 25-5).) The form provided: "Transfer of Instructor of Nursing Unit to SDT under the supervision of Kathleen Engstrom." (Def. Ex. D.) It also announced a new position—"Assistant Director of Nursing"—calling for lesser qualifications and a lower salary than APN. (SOUF ¶¶ 63-65; Def. Ex. D.) The "ADON" position required either a bachelor's degree in Nursing or one additional year of non-supervisory experience. (Def. Ex. E (Doc. No. 25-5).) The related job posting described the title as "Assistant Director Nursing Services1, Psychiatric." (Id.) Plaintiff understood this posting to cover the administrative tasks she had been performing for the Nursing Education Department. (SOUF ¶ 82; Pl. Dep. at 142:3-7.) Lisa Givens, a Black employee, eventually filled the ADON position. (SOUF ¶ 69.)

Finally, it is undisputed that in reorganizing Ancora, Morrison and Canale required "all staff to work in positions that correlated to their highest qualifications." (Doc. No. 25-3 ¶ 26.) For medical APNs like Plaintiff, this meant that they would be assigned to one of Ancora's treatment buildings and perform clinical work. (Id. ¶ 31.)

### Plaintiff's January or February 2019 Meeting with Ngwa

Ancora regularly conducted tours of its simulation lab, during which employees gave presentations. (Pl. Dep. at 29:11-21.) For instance, on January 28, 2019, New Jersey's Health Commissioner visited the lab. (Id. at 29:11-14.) On January 29, 2019, Michael Ajaia, a clinical nurse specialist of African origin, was scheduled to give a presentation for representatives from the Courier Post. (Id. at 19:3-5, 22:18, 29:18-25.) Plaintiff testified that Ngwa decided, however, that "she wanted Yardley Costa who is a white . . . woman to present." (Id. at 29:25-30:2.) After the presentations, Ngwa again said that "she was getting a lot of heat about having Africans in positions and she did not want any problems." (Id. at 30:3-8.)

On January 28, 29, 21, or February 4, Plaintiff met with Ngwa and a union representative—who is also Plaintiff's sister. (Pl. Dep. at 31:7-16 (Plaintiff: "She is my sister biologically.").) Although Plaintiff testified that this was "how it[] began how the retaliation started," she "d[id]n't remember" the meeting's date. (Id. at 28:19-20, 31:21-22.) The participants of the January/February 2019 meeting discussed "why . . . they decide[d] to move [Plaintiff] or [what was] going on." (SOUF ¶ 72; Pl. Dep. at 122:2-5.) It thus appears that sometime *before* the meeting, Plaintiff—who was told in November that all six APNs would be assigned to treatment buildings—learned that she would be assigned to Cedar Hall.

### Return to Clinical Duties

On February 4, 2019, Plaintiff received an HR notice of her reassignment to Cedar Hall, effective February 19, 2019, then changed to February 25, 2019. (SOUF ¶¶ 84, 86-88; Supplemental SOUF ¶ 19.) At that time, Cedar Hall was the only building without an APN (Odunuga having been transferred to Larch Hall). (See SOUF ¶ 33.) Plaintiff began her duties at

6

Cedar Hall on February 25, 2019. (Id. ¶ 90.) She retained her APN position and suffered no reduction in pay or benefits. (Pl. Dep. at 49:5-15.) At Cedar Hall, she returned to the clinical duties APNs customarily perform (and Plaintiff had performed until at least 2017). (See SOUF ¶¶ 5, 46.) Plaintiff thus consulted with patients, assisted nurses with medical procedures, and did other consulting work. (Pl. Dep. at 38:7-16.) Although Plaintiff does not dispute that patients assigned to Cedar Hall usually had developmental disabilities, she believed that Cedar Hall "was the highest in assaults." (Id. at 39:2-4, 91:21-24.) Yet, she acknowledged that "Holly Hall is the criminal psychiatric hall . . . for the criminally insane." (Id. at 40:19-25.) During this period, Plaintiff was also assigned to Elm Hall, which, Plaintiff complains, is "an isolated location." (Doc. No. 26 at 13; Pl. Dep. at 42:20-22.)

From February 2019 to September 2019, Plaintiff took leave intermittently through the Family Medical Leave Act. (Pl. Dep. at 43:10-14; see SOUF ¶ 130.) Her request for a transfer to Evergreen Hall was denied because Evergreen was run by a different state agency without authority to effectuate the transfer. (SOUF ¶ 96; Def. Ex. L (Doc. 25-5); Def. Br. at 11-12.) In September 2019, Plaintiff went out on full-time leave after she suffered a "traumatic" shock when another employee showed her a bullet. (See Pl. Dep. at 32:7-10, 43:18-20, 46:5-25; SOUF ¶ 94.) Plaintiff returned to work on February 22, 2020. (Id. ¶ 105.) In early March 2020, she announced her retirement, effective April 1, 2020. (Id. ¶ 108.) In July 2021, Plaintiff retired. (See Pl. Dep. at 86:25-87:6.)

## II. PROCEDURAL HISTORY

On April 30, 2019, Plaintiff filed an EEOC discrimination complaint against Ancora based on retaliation. (SOUF ¶¶ 117-18, 120.) She alleged that she had been punished after she had

7

complained that Ngwa "displayed preferential treatment towards individuals of African descent." (Id. ¶ 122.)  On the same day, Plaintiff filed a similar retaliation charge against Ancora with the New Jersey Division of Civil Rights.  (Compl. ¶ 8.)  On October 31, 2019, the EEOC issued a right to sue notice.  (Id. ¶ 9.)

On January 23, 2020, Plaintiff filed the instant two-Count Complaint.  (Compl.)  The matter was initially assigned to Judge Bumb and reassigned to me on May 15, 2020.  (Doc. No. 3.)  Plaintiff alleges that because she complained that Ngwa afforded preferential treatment to employees of native African descent, she was impermissibly demoted.  (Compl. ¶¶ 14-17, 22-23.)

Ancora filed the instant Motion for Summary Judgment on July 13, 2022.  (Doc. No. 25.)  The matter has been fully briefed.  (Doc. Nos. 26, 27.)

### III. LEGAL STANDARDS

Summary judgment is warranted if the moving party shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is material only if it could affect the result of the suit under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  I "must view the facts in the light most favorable to the non-moving party" and make every reasonable inference in that party's favor.  Hugh, 418 F.3d at 267.

Summary judgment is also warranted when the movant shows that there is an absence of evidence to support the non-movant's case.  Celotex, 477 U.S. at 325.  The non-moving party "must [then] rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument."  Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006).

If I determine that the moving party is entitled to judgment as a matter of law, I must grant summary judgment in that party's favor. Celotex, 477 U.S. at 322.

## IV. DISCUSSION

The McDonnell Douglas burden-shifting framework applies here. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see, e.g., Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006) (Title VII); Ali v. Woodbridge Twp. Sch. Dist., 957 F.3d 174, 180 (3d Cir. 2020) (NJLAD). Once the plaintiff establishes a *prima facie* case of retaliation, "the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action." Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 193 (3d Cir. 2015). "If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Id. (quoting Moore v. City of Phila., 461 F.3d 331, 342 (3d Cir. 2006)). Plaintiff has not made out a *prima facie* case, nor has she even attempted to show that Ancora's stated reason for its actions—its reorganization plan—is pretextual.

### A. Count I: New Jersey Law Against Discrimination Retaliation Claim

Ancora argues that it is immune from federal suit under the NJLAD. (Def. Br. at 18.) I agree.

The Eleventh Amendment proscribes federal suits brought against an "unconsenting State" or "one of its agencies or departments." Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984); Emps. v. Mo. Pub. Health & Welfare Dep't, 411 U.S. 279, 280 (1973). Plaintiff is thus barred from bringing an NJLAD claim against Ancora in federal court:

> [A] plaintiff may not sue the State of New Jersey, or its alter egos, under the NJLAD in federal court. Although the NJLAD clearly identifies the State as a potential

> defendant, see N.J. Stat. Ann. § 10:5–5(e), and authorizes private suits "in Superior Court," id. § 10:5–13, it makes no mention of federal court. I must conclude, therefore, that New Jersey has not stated "by the most express language" that it is open to private suits under the NJLAD in federal court.

Garcia v. Richard Stockton Coll. of N.J., 210 F. Supp. 2d 545, 550 (D.N.J. 2002) (footnote omitted) (quoting Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 678 (1999)). Accordingly, because this Court "lacks subject-matter jurisdiction, [I] must dismiss" Plaintiff's NJLAD claim. Fed. R. Civ. P. 12(h)(3).

Remarkably, Plaintiff's counsel acknowledges that Ancora is immune from Plaintiff's NJLAD claim. He nonetheless argues that I should not dismiss. Rather, counsel urges that this matter "should [instead] be remanded to state court." (Doc. No. 26 at 10.) It appears that counsel has again failed to consult the law. Where, as here, a case did not begin in state court, remand is improper. Rather, because the Court lacks jurisdiction over this matter—which was originally filed here—I must dismiss. Cf. In re Orthopedic "Bone Screw" Prods. Liab. Litig., 132 F.3d 152, 155 (3d Cir. 1997) (noting that if the case "was removed from state court, it must be remanded," and that "[t]he disposition of such a case will . . . be without prejudice").

Accordingly, I will grant summary judgment as to Plaintiff's NJLAD claim.

### B. Count II: Title VII Retaliation Claim

To make out a *prima facie* case, Plaintiff must show:

> (1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action.

Daniels, 776 F.3d at 193 (quoting Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)) (alteration in original).

Although Ancora agrees that Plaintiff engaged in protected activity when she complained that Ngwa favored employees of native African origin, it argues that Plaintiff has not established an adverse employment action or causation. (Def. Br. at 22-23.) I agree.

Adverse Employment Action

An employer's action is adverse if "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Daniels, 776 F.3d at 195. The Supreme Court defines an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). I must examine the employer's action "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" Burlington N. & Santa Fe Ry. Co., 548 U.S. 53, 71 (2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)). Lateral transfers and changes of title or reporting relationships usually do not constitute adverse employment actions. Barnees v. Nationwide Mut. Ins. Co., 598 F. App'x 86, 90 (3d Cir. 2015). Indeed, "it's a rare case where a change in employment responsibilities qualifies as an adverse employment action." Kidd v. Mando Am. Corp., 731 F.3d 1196, 1204 n.11 (11th Cir. 2013); see Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (agreeing with "other circuits [which] have held that changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes").

When Plaintiff returned to clinical work at Cedar Hall on February 25, 2019, she retained her APN classification; her pay and benefits stayed the same. (SOUF ¶ 90; Pl. Dep. at 49:5-15.)

In fact, Lisa Givens—who assumed Plaintiff's administrative duties after the reorganization—received a lower salary than Plaintiff. (Def. Br. at 8.)

I cannot find that the clinical duties Plaintiff was assigned are "less significant than the [administrative] responsibilities [Plaintiff] previously enjoyed." Crady v. Liberty Nat'l Bank & Tr. Co., 993 F.2d 132, 136 (7th Cir. 1993). To the contrary, Plaintiff was a highly experienced nurse, trained and educated in patient care, not hospital administration. (Pl. Dep. at 7:6-12, 97:2-9.) Plainly, taking care of patients "correlated to [her] highest qualifications" as an APN. (Doc. No. 25-3 ¶ 26.) That is undoubtedly why Plaintiff testified that she was well qualified to do clinical work. (Def. Br. at 29; Pl. Dep. at 41:7-13.)

Nor can I find that a transfer to Cedar Hall—which Plaintiff believes had a higher assault rate than the other Ancora buildings—or Elm Hall—which Plaintiff complains is an "an isolated location"—would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Daniels, 776 F.3d at 195; cf. Yarnall v. Phila. Sch. Dist., 57 F. Supp. 3d 410, 422 (E.D. Pa. 2014) ("I do not agree that requiring [plaintiffs] to move from one functional classroom to another functional classroom . . . is an adverse employment action. The Third Circuit has agreed that requiring an employee to move their office is not an adverse employment action."); see Clayton v. Pa. Dep't of Welfare, 304 F. App'x 104, 107-08 (3d Cir. 2008). Moreover, it is undisputed that Ngwa's office was in Elm Hall, near Plaintiff's office. (Def. Br. at 13; Pl. Dep. at 161:3-12.)

In these circumstances, Plaintiff has not established adverse action by Ancora. Although this is fatal to her discrimination claim, I will nonetheless discuss causation.

Causation

To establish a causal link between a protected activity and an employer's adverse action, the plaintiff may rely on the temporal proximity between the two if "unusually suggestive." Daniels, 776 F.3d at 196 (quoting Marra, 497 F.3d at 302).  The plaintiff must also show that those responsible for the adverse action knew of the plaintiff's protected activity at the time they acted. Id.  A plaintiff making a Title VII retaliation claim "must establish that . . . her protected activity was a but-for cause of the alleged adverse action by the employer."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013).

Plaintiff urges that when "[she] spoke to . . . Ngwa [in late January/early February 2019] about the pattern of hiring Africans . . . the day following that day, . . . Ngwa posted the Plaintiff's job." (Doc. No. 26 at 12.)  She also claims that "[a]fter her job was listed as vacant . . . [she] was later reassigned to Cedar Hall."  Id.  Accordingly, Plaintiff argues that the decisions to post her job and move her to Cedar Hall occurred just after her protected complaint.  The undisputed evidence shows otherwise.

Once again, on November 27, 2018, Plaintiff and all other APNs learned that operational changes conceived by Assistant Commissioner Morrison and CEO Canale would be implemented in the coming months.  Plaintiff thus learned in November that she and the other APNs would be moved to "be in a prescribing role" and "have an assigned building." (Def. Ex. C at 2.) Moreover, the Morrison/Canale Reorganization Plan announced in November changed management responsibility of the Nursing Education Department from CNO Ngwa—for whom Plaintiff worked—to Staff Development and Training Unit head Engstrom—for whom Plaintiff did not work.  (SOUF ¶ 60.)  Cedar Hall was the only building without an APN after Odunuga's 2018 transfer.  (Id. ¶ 33.)  Ancora thus decided in November to have Plaintiff fill this gap—months

13

before her late January/early February 2019 complaint to Ngwa. (Id. ¶¶ 9, 10, 31, 33, 59, 60; Def. Ex. C at 2.)

Contrary to Plaintiff's suggestion, neither the job posting date nor the actual reassignment date is the adverse action date: it is the date of the *decision* to take such action. Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 848 F. Supp. 2d 532, 538 (E.D. Pa. 2012) ("In the employment context, an adverse action is a denial of employment or any other *decision* for employment purposes that adversely affects any current or prospective employee." (emphasis added)). The decision to assign Plaintiff to a treatment building was made on or before November 27, 2018—well *before* her late January/early February 2019 complaint about Ngwa.

The Supreme Court has explained that "[e]mployers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). As I have discussed, Ancora had decided to reassign Plaintiff and the other APNs to treatment buildings well before her complaint about Ngwa. Although Plaintiff cannot remember the actual date she made the complaint (Pl. Dep. at 31:20-22), even assuming it was before the protected activity, announcing Plaintiff's reassignment to Cedar Hall "is not evidence whatever of causality." Accordingly, Plaintiff has not established that her protected complaint was a "but-for cause" of her reassignment.

The Reason for Plaintiff's Reassignment

Finally, Ancora has shown a legitimate, non-discriminatory reason for Plaintiff's transfer: the Morrison/Canale Reorganization Plan was intended to model an employee's "scope of work" to her "highest qualifications." (SOUF ¶¶ 9, 10, 59.) As I have discussed, this included assigning

14

all six APNs to treatment buildings.  It also included reassigning Plaintiff's administrative duties to a lower paid employee.

To refute this legitimate, non-discriminatory reason for her transfer, Plaintiff must present evidence that would allow a factfinder reasonably to infer that Ancora's proffered reason "was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Plaintiff has not even attempted to show pretext.  (See Doc. No. 26 at 10-15.)  Accordingly, Ancora's stated reason for Plaintiff's reassignment stands.

In these circumstances, I am compelled to dismiss Plaintiff's Title VII retaliation claim.

### V.     CONCLUSION

The record, no matter how favorably construed, does not make out retaliation.  Ancora is immune from Plaintiff's state law claim.  Her Title VII claim is not viable: Plaintiff has not shown adverse action, causation, or pretext.  Because no reasonable jury could find that Plaintiff was the subject of retaliation, I will grant Ancora's Motion for Summary Judgment.

An appropriate Order follows.

November 15, 2022                                                                                  */s/ Paul S. Diamond*
                                                                          Paul S. Diamond, J.